In re Hewlett E. MORRIS, Jr., a/k/a H. Edward Morris and Venetha A. Morris, Debtors.

Shaw Steel, Inc., Plaintiff,

v.

Hewlett E. Morris, Jr., a/k/a H. Edward Morris, Defendant.

Bankruptcy No. 97 B 39268.
Adversary No. 98 A 00121.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Feb. 25, 1999.

Gary E. Dienstag, Springer, Casey, Dienstag & De Vitt, P.C., Chicago, IL, Donald N. Jaffe, Persky, Shapiro, Salim Esper, Arnoff & Nolfi Co., L.P.A., Cleveland, OH, for Plaintiff.

Richard L. Hirsh, Richard L. Hirsh & Associates, P.C., Hinsdale, IL, for Defendant.

Gina B. Krol, Cohen & Krol, Chicago, IL, Trustee.

### MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on Count I of Shaw Steel, Inc.'s ("Shaw Steel") amended complaint to determine the dischargeability of a debt, filed under 11 U.S.C. § 523(a)(2)(B), against the Debtor, Hewlett E. Morris, Jr., a/k/a H. Edward

Morris (the "Debtor"). For the reasons set forth herein, the Court, having considered all of the evidence adduced at trial, finds the debt dischargeable, notwithstanding the written material misrepresentations made by the Debtor relating to his financial condition to induce Shaw Steel to accept an offer in settlement of ongoing litigation between them. The Court further finds that Shaw Steel did not reasonably rely on the Debtor's misrepresentations and, therefore, Shaw Steel's claim for the underlying debt owed by the Debtor is not excepted from discharge under § 523(a)(2)(B).

## I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## II. *FACTS AND BACKGROUND*

The Court has previously written two Opinions in this matter which contain much of the background and facts and need not be repeated at length here. On June 30, 1998, the Court dismissed Count II of the amended complaint on the basis that Paragraph 6(a)(i) of the settlement agreement between the parties, wherein the Debtor waived his right to the dischargeability of the debt, could not be enforced as a matter of public policy. *See Shaw Steel, Inc. v. Morris (In re Morris),* 1998 WL 355510 (Bankr.N.D.Ill. June 30, 1998). In addition, the Court held that the Debtor was not collaterally estopped from arguing that the debt is dischargeable. Shaw Steel then moved for summary judgment on Count I of the amended complaint, again arguing that collateral estoppel bars the Debtor from contesting the dischargeability of the debt. The Court denied the motion for summary judgment because not all of the elements for proper application of the doctrine of collateral estoppel were present. *See. Shaw Steel, Inc. v. Morris (In re Morris),* 1998 WL 676999 (Bankr.N.D.Ill. Sept. 22, 1998). The Court hereby incorporates these Opinions by reference.

The parties proceeded to trial on the merits of Count I of the amended complaint, which alleges that the debt owed by the Debtor to Shaw Steel is nondischargeable under § 523(a)(2)(B) regarding a false financial statement given by the Debtor in connection with the settlement in the prior litigation.

The prior litigation emanated from Ohio. On September 1, 1993, the United States District Court for the Northern District of Ohio entered a judgment for $215,836.69 plus interest in favor of Shaw Steel against O.L. Anderson Company ("O.L. Anderson"), a company of which the Debtor was president and whose stock was owned ultimately by Morris Holmes & Co. ("Morris Holmes"). First the Debtor and then the Debtor's wife [1] were the sole common stock owners of Morris Holmes. That court dismissed Shaw Steel's accompanying fraud claim against the Debtor without prejudice. O.L. Anderson subsequently dissolved and Shaw Steel was left unpaid.

On December 1, 1993, Shaw Steel filed another complaint against the Debtor, again in the United States District Court for the Northern District of Ohio, asserting that the Debtor had fraudulently misrepresented O.L. Anderson's financial condition to induce Shaw Steel to grant an increased line of credit to O.L. Anderson. The Debtor claims he could not afford the expense of further litigation. Thus, on July 27, 1994, he executed an offer of settlement with an attached Affidavit of Financial Condition (the "Affidavit") showing his personal financial statement (prepared in connection with another dispute) to convince Shaw Steel to accept his settlement offer.

On August 22, 1994, Shaw Steel accepted the Debtor's offer and signed the document entitled "Settlement Agreement and Mutual General Release" (the "Settlement Agreement"). The Settlement Agreement as signed by the Debtor, including its exhibits, was in Shaw Steel's possession during the month prior to its acceptance and execution of the Settlement Agreement.

---

1. The Debtor assigned 100% of the common    stock of Morris Holmes to his wife in May 1993.

Under the terms of the Settlement Agreement, the Debtor agreed and paid Shaw Steel the sum of $35,000 in exchange for dismissal of the district court action and release of all claims against him. Included in the Settlement Agreement was Paragraph 4, which provided in pertinent part:

4. Representations by Defendant. The parties acknowledge that this Agreement has been entered into, in part, based upon the following representations, only:

   a. Those contained in the Affidavit attached hereto and incorporated herein as Exhibit B; and

   b. That Defendant's personal financial condition has not materially changed since his execution of the Affidavit;

   c. That to the best of Defendant's knowledge, there are no trust agreements in existence in which Defendant, his wife, nor any member of his immediate family has any present or future interest

. . . . .

The Debtor also agreed to execute a Consent Judgment in the underlying action and an Order Setting Aside Dismissal and to place those documents in escrow for 270 days. Settlement Agreement, ¶ 6 [Plaintiff's Exhibit No. 1]. Paragraph 7 of the Settlement Agreement granted Shaw Steel the right to investigate the accuracy of Debtor's financial statements for a period of 270 days from the Debtor's signing.

Paragraph 8 granted Shaw Steel the right to commence arbitration to challenge the material accuracy of the Affidavit. Paragraph 8 further provided that Shaw Steel had the right to enter the Consent Judgment and Order Setting Aside Dismissal in the United States District Court for the Northern District of Ohio in the event that an arbitration panel made an award in its favor.

On August 22, 1994, the same day Shaw Steel signed the Settlement Agreement with the Debtor, it also signed a letter engaging Howard Klein ("Klein"), a certified public account, certified fraud examiner, and certified insolvency and reorganization accountant. Shaw Steel hired Klein to investigate the accuracy of the Debtor's Affidavit attached to the Settlement Agreement.

Klein's subsequent investigation led him to believe that the Affidavit contained multiple inaccuracies. (Klein Report pp. 2–16, 12/3/98 Dep. 14:7 (Klein)). Some have been satisfactorily explained by the Debtor; others have not. Significantly, the investigation revealed that the Debtor failed to disclose substantial income to either Shaw Steel or the United States of America's Internal Revenue Service. (Klein Report pp. 2–16, 12/3/98 Dep. 34:9–11(Klein)). The Debtor did not pay his own rent; he caused Morris Holmes or other companies under his control to make certain rent payments. (Klein Report p. 4, 12/3/98 35:10–13 (Klein)). He did not declare the rent payments as income, nor did he include them in the Affidavit at issue here. (Klein Report pp. 4, 6, 14, 12/3/98 Dep. 51:2–5 (Klein)). The Debtor also failed to disclose the fact that he received the use of two company automobiles at no personal expense. (Klein Report p. 5, 12/3/98 Dep. 51:7–10 (Klein)). He did not reveal that he had received approximately $40,000 in cash advances from the companies under his control. (Klein Report pp. 3, 7, 12/3/98 Dep. 52–56 (Klein)). Klein also concluded, although the Debtor's wife was then the sole owner of the common stock in Morris Holmes, that the Debtor effectively exercised exclusive control over Morris Holmes and its assets and revenues. (Klein Report pp. 9, 12–13, 15). It was his opinion that the Debtor had, therefore, substantially understated his assets as well as his income. (Klein Report pp. 9, 12–13, 15). The Court notes from the Debtor's Affidavit, in pertinent part, provided in ¶ G1 that he had no income in the preceding twelve months from any source whatsoever except fees and commissions from Morris Holmes, Inc. in the amount of $46,937.85, and that "income" was defined in ¶ D ii to include "any and all receipts . . . direct or indirect . . . from any source whatsoever by me . . . or other person or entity acting on my behalf or for my benefit 'including business receipts' contract payments . . . or other distributions."

According to the provisions of the Settlement Agreement, Shaw Steel commenced ar-

bitration against the Debtor. On March 17, 1997, an arbitration panel issued an award in favor of Shaw Steel and assessed the Debtor with certain administrative fees and expenses which were subsequently taxed against the Debtor by the Ohio District Court. The panel found that "there was in fact a material inaccuracy in income as reflected in the Affidavit...."

On August 6, 1997, Shaw Steel again filed suit in the United States District Court for the Northern District of Ohio, seeking enforcement of the Settlement Agreement and the arbitration award. On December 10, 1997, that court issued an opinion and order upholding the arbitration award, including the award of fees, costs, expenses, and administration.

On December 23, 1997, the Debtor and his wife filed with this Court a joint voluntary petition in bankruptcy under Chapter 7 of the Bankruptcy Code. Shaw Steel timely filed this adversary proceeding contesting the dischargeability of the judgment under § 532(a)(2)(B).

### III. *DISCUSSION*

■ A plaintiff seeking to have a debt declared nondischargeable under the Bankruptcy Code bears the burden of proof. *In re McFarland,* 84 F.3d 943, 946 (7th Cir. 1996). The plaintiff must meet this burden by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). To further the policy of providing a debtor a fresh start in bankruptcy, "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor." *Goldberg Securities, Inc. v. Scarlata (In re Scarlata),* 979 F.2d 521, 524 (7th Cir.1992) (quoting *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir. 1985)); *Phillips v. Napier (In re Napier),* 205 B.R. 900, 904 (Bankr.N.D.Ill.1997).

The ultimate issue before this Court is whether Shaw Steel has proved its case under § 523(a)(2)(B). Shaw Steel contends that the debt here at issue arises from the Debtor's misrepresentations in his Affidavit given in support of the terms of the Settlement Agreement. As such, Shaw Steel argues, the debt is nondischargeable under

§ 523(a)(2)(B), which provides in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing or credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor os liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B).

■ To prevail on a complaint under § 523(a)(2)(B), Shaw Steel must prove five elements: (1) the Debtor made a statement in writing; (2) the statement was materially false; (3) the statement concerned the Debtor's financial condition; (4) in making the misrepresentation, the Debtor had an intent to deceive Shaw Steel; and (5) Shaw Steel actually and reasonably relied upon the misrepresentation. *Napier,* 205 B.R. at 905; *see also, In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995). Shaw Steel must establish each and every element. *First Security Bank of Fox Valley v. Ardelean (In re Ardelean),* 28 B.R. 299, 301 (Bankr.N.D.Ill.1983). The first and third elements are met here and are not in dispute. The second, fourth and fifth elements are in dispute.

■ The Debtor raises a threshold issue of whether he obtained money, property, services, or an extension, renewal, or refinancing of credit. There is no question that O.L. Anderson obtained raw materials on credit from Shaw Steel and never paid for them. However, Paragraph One of the Settlement Agreement expressly releases the Debtor from that claim. Therefore, the Court need not determine whether the Debtor originally obtained materials and credit by fraud, but rather must focus on whether he obtained the release by fraud. *See, In re West,* 22

F.3d 775, 777 (7th Cir.1994) (concluding that a note given in settlement of a claim for embezzlement substituted a contractual obligation for the tortious one). Thus, the threshold issue is whether that release represents money, property, services, or credit for purposes of § 523(a)(2).

The Court holds that a party obtaining release from a claim has obtained property for purposes of § 523(a) when that party later becomes a bankruptcy debtor. " 'Property' is a word of very broad meaning, and when used without qualification, expressly made or plainly implied, it reasonably may be construed to include obligations, rights, and other intangibles as well as physical things." *Fidelity & Deposit Co. of Maryland v. Arenz,* 290 U.S. 66, 68, 54 S.Ct. 16, 78 L.Ed. 176, (1933). One party releasing another party from a claim relinquishes an important right; the right to sue on that claim. "The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government." *Chambers v. Baltimore & Ohio R.R. Co.,* 207 U.S. 142, 148, 28 S.Ct. 34, 52 L.Ed. 143 (1907).

In this case, the Debtor paid $35,000 and made various representations in exchange for the release of Shaw Steel's right to sue the Debtor on the underlying claim that he had obtained credit for O.L. Anderson by fraudulently misrepresenting its financial condition. By obtaining that release, the Debtor obtained a valuable property right from Shaw Steel. Thus, the Court rejects the Debtor's argument that Shaw Steel cannot invoke § 523(a)(2)(B) after releasing its underlying fraud claim against the Debtor concerning O.L. Anderson's financial condition.

Having settled that the Debtor obtained property from Shaw Steel, it remains to determine whether Shaw Steel has established the five elements of its claim under § 523(a)(2)(B) arising from the Affidavit concerning the Debtor's personal financial condition. The Affidavit is clearly a statement in writing and it is a statement representing the Debtor's financial condition. The parties have no dispute regarding these two elements. To prove its case, Shaw Steel must therefore show by a preponderance of the evidence the three disputed elements: (1) that the Affidavit was materially false; (2) that the Debtor made it with the intent to deceive Shaw Steel; and (3) that Shaw Steel actually and reasonably relied on the statement.

### Material Falsity

■ The principal contention of the Debtor on this element is that any inaccuracies in his Affidavit were not material because the Debtor's financial condition at that time was even worse than represented. The Court disagrees and finds that Shaw Steel has met its burden of proving material falsity in the Debtor's Affidavit because it did not fairly reflect the true extent or picture of the Debtor's then financial situation and income.

■ Material falsity is an important or substantial untruth. *In re Bogstad,* 779 F.2d 370, 375 (7th Cir.1985). "It is well-established that writings with pertinent omissions may qualify as materially false for purposes of § 523(a)(2)(B)." *Community Bank of Homewood–Flossmoor v. Bailey (In re Bailey),* 145 B.R. 919, 930 (Bankr.N.D.Ill.1992). There are two tests for determining whether a statement is materially false. Under the first, known as the "substantial untruth" test, a statement is materially false if it "paints a substantially untruthful picture ... by misrepresenting information of the type which would normally affect the decision to grant credit." *Banner Oil Co v. Bryson (In re Bryson),* 187 B.R. 939, 962 (Bankr.N.D.Ill. 1995) (citation omitted). An alternative test to determine "materiality" is the "but for" test. The Seventh Circuit has noted that the *sine qua non,* or "but for" test [2] is a "recurring guidepost" for determining material falsity. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw),* 895 F.2d 1170, 1172 (7th Cir.1990); *Bogstad,* 779 F.2d at 375. However, the Seventh Circuit has not decided whether satisfaction of the "but for" test is an essential part of a claim under

---

2. The "but for" test requires a creditor to prove that "but for" the material misrepresentations, he would not have extended money, property, services, or credit. *See, e.g., Westbank v. Grossman (In re Grossman),* 174 B.R. 972, 984 (Bankr. N.D.Ill.1994).

§ 523(a)(2)(B). *Harasymiw,* 895 F.2d at 1172. Bankruptcy judges in this district have applied both tests. *See Napier,* 205 B.R. at 906 (listing cases using either or both tests).

In this case, the Court finds that Shaw Steel has demonstrated material falsity under either test. This Court agrees with the arbitration panel that the Debtor materially misrepresented his income.[3]

Shaw Steel placed in evidence Klein's detailed report and his deposition testimony. Klein found that the Debtor's actual income, paid almost entirely by Morris Holmes, for the twelve months preceding the Affidavit should have been $118,540.95 and not the $46,937.85 as stated by the Debtor. Klein based his conclusions upon his review of the Morris Holmes general ledger and trial balances. Significantly among many misstatements, Klein discovered that the Debtor had caused Morris Holmes to pay the rent, amounting to $30,855, on the Debtor's only place of residence for the preceding twelve months. The Debtor's Affidavit did not disclose these payments. Klein's report referenced copies of the relevant IRS regulations which show that such classification was improper. Klein discovered that Morris Holmes owned two automobiles and that same were used by the Debtor, its only employee. However, the Debtor's Affidavit did not disclose his right to use these automobiles. Klein also concluded that the Debtor had received salary "advances" of $40,185.95 which he failed to timely report as income. Although Klein conceded that inclusion of the undisclosed income triggering the additional attendant tax liabilities would have had a negligible net effect on the Debtor's net

worth, the Court rejects the Debtor's conclusion that same was immaterial. Rather, the distorted income picture was significant and material. A creditor like Shaw Steel could equally focus on the Debtor's income statement for purposes of determining whether to settle rather than base its decision only on the net worth shown on a related balance sheet.

The Debtor did not offer a third-party expert witness. He countered Klein's report only with his own self-serving testimony. The Debtor, who is an experienced accountant,[4] opined on his own behalf that he properly treated the rent payments as expenses for travel or temporary relocation. Even aside from the questionable reporting for income tax purposes, it is obvious that an individual who receives income of over $46,000 per year from which he pays no rent or mortgage, which is paid by another entity he controls, has far greater spending (or settlement paying) power than an individual receiving $46,000 per year who pays his housing costs out of that total. The Debtor's Affidavit failed to disclose this information to Shaw Steel.

The same is true as applied to the automobiles. The Debtor attempted to raise an implication that he received no personal benefit from the use of two company cars in a company he controlled, and of which he was the only employee. The Court rejects this implication, and finds the Debtor's contention that he innocently forget or unintentionally omitted to disclose his true income disingenuous and not credible. Nor does the Court accept the Debtor's testimony that he had no obligation to disclose to Shaw Steel the cash

---

3. The Court agrees with the Debtor that by the time he gave the financial statement to Shaw Steel, the Debtor had assigned all Morris Holmes stock to his wife. While the Debtor still controlled Morris Holmes, he did not own its common stock. The Court further agrees with the Debtor that had he honestly reported his income to the IRS, his net worth would have been even lower than that represented in the Affidavit, as the Debtor would have incurred tax liabilities on the income. Agreement on these points does not alter the fact that the Debtor created the false impression that his income was between $70,000 and $80,000 less than it actually was. The important point is that the Affidavit did not accurately portray the Debtor's then financial condi-

tion and true income. Rather, it distorted the real situation which was even worse than the Affidavit portrayed. That the true picture would have made it obvious that Shaw Steel could not likely then recover anymore than the Debtor was offering it in settlement is unavailing.

4. The Debtor testified that he holds a bachelor's degree in accounting, and that he passed the CPA examination, but has not applied for the license. He has previously worked as an accountant at Price Waterhouse for several years, over the course of which he was promoted first to Senior Accountant and then to Manager.

advances he took from Morris Holmes. He took the money and spent it, according to his testimony, for living expenses and taxes. He testified that if, for some reason, when he closed the books on the fiscal year, he found that he had not "earned" the money, he would be obligated to replace it. However, never in any year for which Morris Holmes' books are in evidence did he do so.

The Debtor made much of the fact that disclosure of the unreported income would decrease, rather than increase, his net worth because of the accompanying tax liabilities. While the Court agrees that this is true, the truth does not change the substantiality of the falsehood and the attendant distortion of the true income situation not revealed by the Affidavit. It is generally true that a man who earns $118,000 per year has greater resources at his command than a man who earns only $46,000. Although disclosure of the additional income with attendant liabilities might have decreased the Debtor's immediate net worth on the balance sheet, Shaw Steel might have concluded that the Debtor could have had prospects for substantially increased future net worth or ability to make future payments on the debt from the additional income.

At trial, Mel Morris ("Morris"),[5] the vice-president and 50% stockholder of Shaw Steel, testified unequivocally that he executed the Settlement Agreement with the Debtor only because of Debtor's assertions, supported by the Affidavit, that $35,000 was all he could pay of the $215,000 owed to Shaw Steel. He accepted the settlement offer because the Debtor's financial statement indicated that $35,000 was the most that Shaw Steel likely ever could recover. Mel Morris' testimony was credible, thus the Court finds that but for the misrepresentations in the Debtor's Affidavit, Shaw Steel would not have entered into the Settlement Agreement.

### Intent to Deceive

■■■■ The Court finds that the Debtor intended to deceive Shaw Steel by providing it the Affidavit which distorted his true income. That the Affidavit was prepared in connection with another disputed creditor's claim is of no consequence as the Debtor willingly submitted it to Shaw Steel to support his offer to settle with it. A party can prove an intent to deceive either through direct evidence or by creating an inference from a misrepresentation which the debtor knows or should know will induce another to act. *Sheridan,* 57 F.3d at 633, *Napier,* 205 B.R. at 907. "A debtor's intent to deceive may also be demonstrated by proving reckless indifference to, or reckless disregard for, the accuracy of the information in the financial statement." *Napier, Id.* at 907. The debtor's intent to deceive may also be inferred from surrounding circumstances. *Id.*

In *Ardelean,* the Court based a finding that the debtor intended to deceive on his testimony that he "forgot" a $50,000 liability on which he had paid $9,000 that same day. 28 B.R. at 302. Similarly, the Court cannot accept that the Debtor inadvertently omitted to mention he received benefits via his housing subsidies and other perquisites from Morris Holmes worth more than $30,000 per year. Nor can the Court agree that he considered these rent payments unimportant or irrelevant in the context of the sworn statement he made of his financial condition. The same is true for the omitted cash advances and the automobile usage he was afforded. Omission of material income distorting a written financial statement has been found to circumstantially lead to proper inference of the requisite scienter element. *See, e.g., Citibank (S. Dakota) v. Harris (In re Harris),* 203 B.R. 117, 122 (Bankr.N.D.Ill. 1996) (failure to disclose $20,000 in loans less than six months old was reckless indifference and disregard for the accuracy of the information).

The Debtor's failure to disclose the true amount of attributable income and benefits paid to him over the preceding twelve months shows in the Affidavit a similar reckless indifference and disregard. This is particularly compelling given the Debtor's substantial experience and education, even if he has not bothered to obtain his license as a Certified Public Accountant. After all, he took and passed the exam, is an experienced accountant, and is therefore more knowl-

---

5. Mel Morris is not related to the Debtor, Ed Morris.

edgeable than the average person about what should be properly included in the income statements, which are integral parts of the Affidavit. Disclosure, not concealment or obfuscation, is the operative principal applicable.

Repeated and continuing omissions in statements represented as giving a complete picture of the debtor's finances were at best grossly reckless as found in *Northern Trust Co. v. Garman (In re Garman)*, 643 F.2d 1252, 1260 (7th Cir.1980). The Debtor's omissions from his Affidavit, which produced an incomplete and inaccurate picture of his finances, are at best grossly reckless and the Court finds the requisite fraudulent scienter.

In this case, the Debtor's actual annualized income, either in direct cash payments or in attributable benefits paid by a corporation of which he was in substantial control, was between two and three times that set forth in his Affidavit. The Debtor is an experienced businessman, an accountant, and a financial consultant. He himself prepared the Affidavit. He provided it to Shaw Steel to induce Shaw Steel to accept his settlement offer on the theory that he could pay no more than that which he offered. Shaw Steel has sufficiently proved that the Debtor recklessly and indifferently submitted a false Affidavit with the intent to deceive by the preponderance of the credible evidence.

### Actual and Reasonable Reliance

The last element is whether Shaw Steel proved that it actually and reasonably relied on the Debtor's material false statements in his Affidavit at the time Shaw Steel accepted and executed the Settlement Agreement and released its underlying claim against him. Reasonable reliance is a question of fact to be determined on a case by case basis. *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir.1989). Where no "red flags" suggest that the debtor has made false statements, the creditor has no duty to investigate to determine the truth. *Huntington Nat'l Bank of Indiana v. Perk (In re Perk)*, 227 B.R. 846, 849 (Bankr.S.D.Ind.1998). Equally true is the converse: where there are "red flags," the creditor has a duty to reasonably investigate before it extends the credit, furnishes the services, loans the money or parts with its property for the benefit of the debtor. Thus, where there is evidence that the debtor has a reputation for untruthfulness, reliance upon his Affidavit without investigation is obviously unreasonable. *Bogstad*, 779 F.2d at 372–73 n. 4.

Mel Morris' testimony left no doubt that by the time (and long before) he signed off on the Settlement Agreement, the Debtor had a reputation with Shaw Steel for untruthfulness. Mel Morris testified at trial that he had reservations about the Debtor at the time of settlement with Shaw Steel. He testified that others had "lost millions" with the Debtor. He testified that "not on his life" would he have entered into the Settlement Agreement without the right to investigate, and that he signed with the intent to subsequently conduct an investigation. Mel Morris drew his conclusions about the Debtor's lack of truthfulness as early as 1992, when he discovered that the Debtor had grossly overstated O.L. Anderson's net worth. He stated that the Debtor had a propensity to "curb or not tell or change the truth." He swore that it was his everlasting impression that the Debtor had lied to Shaw Steel.

Further, Klein testified that Mel Morris and Harry Sulzer, the president of Shaw Steel, told him when they hired him that they did not believe the Debtor's financial statement. Given these circumstances, the sky over Shaw Steel was thick with red flags flying about the Debtor's veracity in the period between July 27 and August 24, 1997.

Instead of immediately directing Klein to investigate the truth of the Debtor's Affidavit, Shaw Steel leaped before it looked. It accepted the Debtor's offer first and started to investigate the truth of the matters in the Affidavit about a month later, after it had taken his money and released its underlying claim.

The Court acknowledges that Shaw Steel actually relied upon the existence of the Affidavit as a basis for accepting the Settlement Agreement. Shaw Steel's actual reliance upon the statement's existence is not the same as the required reasonable reliance upon the Affidavit's truthful content. Shaw

362

Steel did not reasonably rely upon the truth of the Affidavit given by the Debtor, whom it considered to be a liar, by releasing its claim and taking the money before investigating the accuracy of the Debtor's representations. Shaw Steel unreasonably relied upon its right to subsequently investigate. That, under the cases of *Bogstad, Bonnett* and *Perk, supra,* is unreasonably putting the cart before the horse, or, in this case, letting the fox (the Debtor) out of the hen house after he has bagged the chickens (the release).

Mel Morris testified that Shaw Steel felt safe with the terms of the Settlement Agreement, knowing that if the Debtor's Affidavit was truthful, then $35,000 was better than nothing. Shaw Steel further knew that if the investigation revealed the statement was false, it had "leapfrogged" litigation and could proceed with the consent judgment. This is not reasonable reliance upon the truth of the Debtor's Affidavit; this is merely actual reliance on the right to subsequently investigate and invoke alternative remedies. The Court finds this reliance unreasonable in light of all the prior problems Shaw Steel had had with representations made by the Debtor respecting O.L. Anderson's financial condition.

### IV. *CONCLUSION*

For the foregoing reasons, the Court finds the debt of the Debtor to Shaw Steel dischargeable under 11 U.S.C. § 523(a)(2)(B). Judgment shall enter in favor of the Debtor–Defendant in this adversary proceeding. This Opinion serves as findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.